Honour BROWN, Individually and as Personal Representative of Cary Brown and as Administratrix of the estate of Gary Brown, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 81–168–T.

United States District Court, D. Massachusetts.

Aug. 12, 1985.

Michael B. Latti, William J. Griset, Jr., Latti Associates, Boston, Mass., for plaintiff.

David Hutchinson, Trial Atty., U.S. Dept. of Justice, Torts Branch, Washington, D.C., for U.S.

Astrid C. Glynn, Glynn & Dempsey, Boston, Mass., for Sea Fever Corp.

Robert L. Athas, Boston, Mass., for Gloucester Marine Railways.

## MEMORANDUM

TAURO, District Judge.

In an opinion issued December 21, 1984, this court narrowly applied traditional tort principles to a unique factual setting in holding the government liable, because of its failure to properly maintain a computerized weather buoy, for the drowning deaths of three lobster fishermen.[1] *Brown v. United States*, 599 F.Supp. 877 (D.Mass. 1984). On January 28, 1985, a bench trial was held on the issue of damages. After the submission of post-trial briefs, the damages controversy was taken under advisement on June 6, 1985.

Plaintiffs seek to recover damages under the Death on the High Seas Act, 46 U.S.C. § 761–768 (DOHSA), which provides a cause of action "[w]henever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league[2] from the

---

1. This suit against the United States was permitted by the Suits in Admiralty Act, 46 U.S.C. § 741–742 (1982), which provides in pertinent part:

 In cases where ... if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States.... 46 U.S.C. § 742.

2. A marine league is three miles. In this case, the deaths of the lobster fishermen occurred approximately 100 miles offshore.

shore ... of the United States." DOHSA allows "fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. § 762. In *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 584–85, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974), the Court recognized that loss of support is an element of pecuniary loss under DOHSA, and defined loss of support to include "all the financial contributions that the decedent ... would have made to his dependents had he lived." The Court also recognized that the "monetary value of the services the decedent ... would have continued to provide" is recoverable under DOHSA, including the value of the "nurture, training, education, and guidance that a child would have received."

In addition to seeking damages under DOHSA, plaintiffs seek compensation for the pain and suffering of their decedents. Plaintiffs' respective claims are discussed below.

## I

### Gary Brown

Gary Brown was born on October 3, 1953 and drowned on November 22, 1980 at the age of 27. He married two months before his death. At the time of Gary's death, his wife, Honour, was pregnant with their daughter, Cary Brown, who was born in 1981.

Honour Brown is entitled to the aggregate income Gary Brown would have earned, less the amounts he would have

paid in federal and state taxes, *See Jones & Laughlin Steel v. Pfeifer*, 462 U.S. 523, 534, 103 S.Ct. 2541, 2549, 76 L.Ed.2d 768 (1983),[3] and for personal maintenance, *Higginbotham v. Mobil Oil*, 360 F.Supp. 1140, 1144 (W.D.La.1973), *aff'd in relevant part*, 545 F.2d 422 (5th Cir.1977), *rev'd on other grounds*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). In order to make this calculation, this court must determine the rate at which Gary Brown's income would have increased during the years of his employment.

The defendant's expert assumed that Gary Brown was a typical fisherman and concluded that his earnings would have increased at a rate of 6% a year. His testimony was based on the fact that fishermen's wages have increased at that rate during the past ten years (Tr. 5–160). The defendant's expert, however, did not consider the actual rate at which Gary Brown's income grew during the years preceding his death. Moreover, he failed to consider that Gary Brown was a lobsterman and not an ordinary fisherman (Tr. 5–169).

Plaintiffs' expert, on the other hand, examined Gary Brown's tax returns for the years 1977 to 1980 and concluded that, had he not been killed, his income would have continued to increase at an 11% rate until March 1, 1985. Applying that rate of increase to Gary Brown's 1980 earnings of $21,555, plaintiffs' expert calculated that Gary Brown would have had annual earnings of $37,087 as of March 1, 1985 (Tr. 5–131, 150).[4]

---

**3.** *See also Norfolk & Western Railway v. Liepelt*, 444 U.S. 490, 493, 100 S.Ct. 755, 757, 62 L.Ed.2d 689 (1980).

**4.** In order to facilitate the calculation of Gary Brown's lost earnings, this court will assume that his earnings ceased to increase at a rate of 11% as of January 1, 1985. Thus, Gary Brown would have had a 1985 income of $36,290, rather than the $37,087 that plaintiffs's expert projected. *See* Appendix A.

The plaintiff also presented evidence that Gary Brown's earnings would have been considerably higher. Peter Brown (unrelated) was captain of the F/V Sea Fever at the time of Gary Brown's death. He testified that Gary, within a year,

would have become a deckhand on a 70–foot vessel, and that deckhands on such vessels typically make $35,000 annually (Tr. 5–33, 34). Peter Brown also testified that, in his opinion, Gary would have been a captain of a 70–foot vessel by the time of the damages trial, and that captains of 70–foot vessels typically make $50,-000 a year (Tr. 5–31, 34). While Peter Brown's testimony was credible and corroborative, this court finds it more appropriate to rely on the rate of increase of Gary Brown's earnings manifested in his tax returns.

For the period following March 1, 1985, plaintiffs' expert made the conservative assumption that Gary Brown would not have made any further career advances and that his wages would have only increased at a rate of 1.5% a year, representing the benefit he would have received from the general increases in productivity that permeate the economy and benefit all American workers (Tr. 5–132). *See Jones & Laughlin Steel v. Pfeifer,* 462 U.S. 523, 535–36, 103 S.Ct. 2541, 2549–50, 76 L.Ed.2d 768 (1983) ("productivity increases ... have been a permanent feature of the national economy since the conclusion of World War II"); *O'Shea v. Riverway Towing Corp.,* 677 F.2d 1194, 1200 (7th Cir.1982) (plaintiff "could expect her real wages ... to rise ... as average real wage rates throughout the economy rose, as they usually do over a decade or more").

In calculating the aggregate amount of income a decedent would have earned, a court may not simply add up the salary plaintiff would have received during his work-life expectancy. Rather, the court must discount the decedent's projected earnings so as to arrive at their present value. Establishing the appropriate discount rate is, of course, the threshold task.

At trial, the parties offered two alternate methods of ascertaining the proper discount rate. Plaintiffs' expert economist proposed a "real" discount rate. A real discount rate is based on the "fairly constant relationship between interest and inflation rates." *Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30, 37 (2d Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981). The real discount rate itself is the margin by which the interest rates of risk-free instruments (such as Treasury securities) historically exceed inflation.[5]

Plaintiffs' expert employed a real discount rate of 3.5%. He made this selection based on his findings that the interest rate on Treasury securities was 2.5% to 3.0% during the fifties, when there was little inflation and slight expectation of future inflation. He also noted that high grade corporate bonds paid interest of 3.5% to 4.0% during the fifties (Tr. 133). The higher rate of interest paid on corporate bonds apparently caused plaintiffs' expert to opt for a higher discount rate than the rate paid on Treasury securities.

■ From the plaintiffs' standpoint, their expert's selection of a 3.5% discount rate was extremely conservative. The rate of corporate bonds should not have had an impact on the plaintiffs'. expert's selection of a real discount rate, for even the highest quality corporate bond contains an element of risk that is reflected in a higher interest rate. Consequently, the interest rate of corporate bonds is an inappropriate measure of the real or risk-free discount rate.

A real discount rate of 3.5% also appears high in light of other analyses. In *Doca,* the Second Circuit adopted Judge Blumenfeld's methodology in *Feldman v. Allegheny Airlines,* 382 F.Supp. 1271, 1310 (D.Conn.1974), *aff'd* 524 F.2d 384 (2d Cir. 1975), for calculating the real discount rate. Judge Blumenfeld found the interest rates on Treasury securities for each year between 1952 and 1966. He then subtracted the percentage rise in the Consumer Price Index for that corresponding year.[6] This methodology yielded a real discount rate of 2% which the Second Circuit employed in *Doca.* Moreover, the Supreme Court has

**5.** Interest rates are composed of three components: the actual increase in the purchasing power of money over time (the real interest rate), expectations of inflation, and risk. The objective in calculating the real discount rate, therefore, is to isolate the real interest component from the inflation and risk components. Risk is eliminated by using the interest rate of a risk-free instrument. Inflation is eliminated by either looking at the risk-free interest rate at a time when there is no inflation, or subtracting the rate of inflation for a particular year from the risk-free interest rate for the corresponding year.

**6.** Judge Blumenfeld's findings show that inflation, while slight in the fifties, did exist. Plaintiff's expert did not take into account that slight inflation. That is another reason why his projected discount rate must be considered too high.

held that a trial court may reasonably estimate the real discount rate at between 1 and 3%. *Jones & Laughlin*, 462 U.S. at 548–49, 103 S.Ct. at 2556.

Defendant's expert did not use a real discount rate. Rather, he projected a 6% increase in Gary Brown's salary throughout his 32 year work-life expectancy. He then discounted that future stream of earnings at a rate of 10%, the rate paid by long-term municipal bonds at the time of trial.

■ This court finds that the plaintiffs' expert's approach, forecasting real wage increases and then discounting the resultant real wages at a real discount rate, is more credible and reliable than that employed by defendant's expert. Plaintiffs' method eliminates unnecessary speculation as to the level of future inflation. The fairly constant differential between interest and inflation rates, on which the real discount rate is premised, makes it more reasonable to predict the relationship between the two rates than to predict the level of either rate in isolation. *See Doca*, 634 F.2d at 37. Defendant's expert took the more precarious route of assuming a certain rate of inflation, although it is not possible to assign a number to that rate because he did not break down his 10% discount rate into the components of risk, future expectation of inflation, and the real interest rate.[7] Assuming the defendant's expert believed that the risk of the municipality failing to meet its obligations was negligible,[8] and further assuming that he believed the real rate of interest was 2%, he would be assuming an 8% rate of inflation in the future. He would further be assuming that Gary Brown's wages, which he projected to increase at a rate of 6% a

year, would be losing ground to inflation at a rate of 2% a year.

Recognizing how speculative it is to project future inflation, the First Circuit in *Williams v. United States*, 435 F.2d 804, 807 (1st Cir.1970), rejected any consideration of the impact of inflation on lost future earnings. More recently, however, the First Circuit noted in dicta that "courts around the nation have not been oblivious to the effects of inflation on damage awards," citing *Doca*. *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 664 n. 17 (1st Cir.1981). Indeed, the approach used in *Doca* of utilizing the real discount rate has the desirable effect of taking inflation into account without having to speculate on its precise rate. Instead, the discount rate is based on the relatively constant historical relationship between inflation and interest rates. *See Doca* at 634 F.2d at 39 n. 10.

Having decided that a real discount rate should be used, the next question to be resolved is the amount of that rate. For the reasons stated above, this court believes that the 3.5% real discount rate selected by the plaintiffs' expert is too high. This is particularly true in light of the fact that this court is obligated to deduct from decedent's lost earnings the amount he would have paid in taxes. The combination of deducting future taxes and using a real discount rate derived from the Treasury rate has the effect of taxing the plaintiff twice; once at the time of judgment, and again when the plaintiff receives interest payments from the Treasury securities in which she will presumptively invest. *See O'Shea v. Riverfront Towing Co.*, 677 F.2d at 1201.

This consideration may have motivated defendant's expert to base his discount rate

---

7. *See supra*, n. 5.

8. To the extent that the defendant's expert believed otherwise, his use of the 10% interest rate paid by municipal bonds was improper. Inherent in the concept of selecting a discount rate is the belief that the plaintiff can invest her lump-sum judgment in a risk-free instrument paying interest at the same rate as the discount rate, thus producing a stream of earnings equal to

the amount her decedent would have earned had he survived. It would be unsound to use the municipal bond rate as the discount rate on the theory that Honour Brown would receive interest at a rate of 10% from investing in municipals, there being at least some possibility that the municipalities would not be able to honor their obligations. *See Jones & Laughlin*, 462 U.S. at 537, 103 S.Ct. at 2550.

on the municipal bond interest rate. The interest rate of a risk-free municipal bond, adjusted for inflation, would indeed be the ideal rate for discounting a stream of after-tax earnings to present value, because that rate would itself be an after-tax discount rate due to the exemption from federal taxation of municipal bond interest.[9] The interest rate on a risk-free municipal bond would inevitably be lower than that on a Treasury security, due to the federal tax exemption accorded to municipal bond interest, with the result that the discount rate would also be lower. While these considerations may cast the *Doca* 2% discount rate as conservative, it is nonetheless reasonable, given the difficulty of projecting a risk-free municipal bond rate and the less than perfectly stable nature of the real discount rate. *See Jones & Laughlin,* 462 U.S. at 548 n. 30, 103 S.Ct. at 2556 n. 30.

As stated above, this court must account for the taxes Gary Brown would have paid had he remained alive. These taxes can best be estimated by constructing the amount of federal and state taxes that Gary Brown would have paid on the $36,291 in income he would have received in 1985, *see* Appendix A, and then applying that tax rate to all of his earnings.[10] This methodology reveals that Gary Brown's gross lost earnings should be reduced by 18.4% to reflect the federal and state taxes that he would have paid.

■ In addition, this court must take into account the percentage of earnings that Gary Brown would have spent on personal maintenance. In *Higginbotham, supra,* the district court reduced the aggregate lost earnings of each of the decedents by 15% to reflect the amount they would have spent on personal maintenance. 360 F.Supp. at 1144. In this case, defendant's expert testified that, based on U.S. Department of Labor data for a typical family of three, Gary Brown could be expected to spend 18% of his before-tax income on personal maintenance during his daughter's minority and 23% of his income on personal maintenance thereafter (Tr. 5–162).[11] Given the fact that Gary Brown's occupation as a fisherman would have required him to be at sea for significant periods of time, during which he would have spent very little if anything on himself, it is appropriate to reduce Gary Brown's before-tax income by only 15% to reflect the amount he would have spent for personal maintenance.

■ The government contends that Honour Brown's pecuniary losses should be further reduced to reflect the fact that she has remarried. The strong policy considerations against discouraging remarriage, by

9. The assumption underlying the use of such a rate is that the plaintiff would invest her entire judgment in risk-free municipal bonds. The plaintiff would not be taxed on the interest received on the bonds, an appropriate result given the fact that future taxes were deducted in calculating her judgment.

10. Federal Tax

| | |
|---|---|
| $36,291 | Gross Income |
| −2,000 | IRA |
| −3,000 | Dependents |
| $31,291 | Taxable Income |
| $ 5,175 | Federal Tax (Derived from 1984 Table) |

Massachusetts Tax

| | |
|---|---|
| $36,291 | Gross Income |
| −3,900 | Exemptions ($3,200 for taxpayer and non-working spouse, $700 for dependent) |
| − 600 | Deduction for Child |
| −1,400 | Estimated Social Security Deduction |
| $30,391 | Taxable Income |

Massachusetts Tax

| | |
|---|---|
| $ 1,520 | Massachusetts Tax (Derived from 1984 Table) |

$6,695 Total Tax (18.4% of Gross Income)

While Honour Brown was working at a nursing home at the time of her husband's death (Tr. 5–49), she and Gary had decided that she would stop working once their baby was born (Tr. 5–51). Honour has not in fact returned to work since Cary Brown's birth. Thus, Gary Brown's earnings would have constituted the family's sole income.

11. The defendant's figures for percentage of gross income spent on personal maintenance were based on a family of three with an income of $25,000. One would expect that percentage would be lower for a family of three with an income of $36,000, the position Gary Brown's family would now be in had he not perished.

conditioning damage awards upon a plaintiff's remaining single, militate against such an approach. *See Blumenthal v. United States*, 189 F.Supp. 439, 449 (E.D. Pa.1961), *aff'd* 306 F.2d 16 (3d Cir.1962) (widow's damages under DOHSA could not be reduced because of her subsequent remarriage).

The government also argues that Honour Brown's award must be reduced by certain Social Security benefits that she is allegedly receiving. At trial, however, the government did not take advantage of the opportunity to question Honour Brown about these benefits. Instead, the government merely submitted a deposition taken of Honour Brown over two years earlier, on January 12, 1983, in which she stated that she was receiving Social Security benefits. Thus, there was no evidence introduced at trial as to whether Honour Brown is still receiving benefits. Moreover, the deposition itself does not establish whether she was receiving benefits in 1983 as a result of her husband's death or for some other reason.

■ Even assuming that Honour Brown is currently receiving benefits as a result of her husband's death, her award cannot be reduced by those benefits. In analogous cases under the Federal Tort Claims Act (FTCA), the Third, Ninth and Tenth Circuits have all held that damage awards should not be offset by the receipt of Social Security payments. *See Smith v. United*

*States*, 587 F.2d 1013, 1016 (3d Cir.1978); *Steckler v. United States*, 549 F.2d 1372, 1379 (10th Cir.1977); *United States v. Hayashi*, 282 F.2d 599, 603–04 (9th Cir.1960). These courts have relied on the "collateral source" doctrine.[12] In *Smith*, the court stated:

> [W]here state law recognizes the "collateral source" doctrine, Social Security benefits should not be deducted from a recovery under the Federal Tort Claims Act. FTCA recoveries come out of the general revenues; Social Security benefits are funded almost entirely from employee and employer contributions.[13]

The view that Social Security benefits come from a special fund created by the contributions of working men and women and their employers has led the courts in *Hayashi* and *Steckler* to distinguish between Social Security payments and Veterans Administration payments for disability and hospital expenses which derive from the general revenues.[14] In making this distinction, the Tenth Circuit stated in *Steckler:*

> Logically [Social Security disability payments] are collateral.... The extent to which such payments can be traced to the government is questionable. The part contributed by the worker and the employers has the aspect of social insurance and as such is collateral to the monies contributed by the government.[15]

---

**12.** In *United States v. Price*, 288 F.2d 448, 449 (4th Cir.1961) (plaintiff's benefits under Civil Service Retirement Act, 5 U.S.C. § 2251 *et seq.*, were from collateral source and consequently could not be offset against his FTCA recovery), the Fourth Circuit explained the collateral source rule as follows:

> There may be some variations among different jurisdictions, depending perhaps upon the exact nature of the compensation received, but the broad rule seems to be that where the plaintiff receives from the tort-feasor payments specifically to compensate him for his injury, the tortfeasor need not pay twice for the same damage, and therefore such compensation payments should be taken into account in fixing tort damages.... On the other hand, where the injured plaintiff's compensation comes from a "collateral source," it should not be offset against the sum awarded

for the tort nor considered in determining that award.

**13.** Gary Brown's tax returns reveal that he paid self-employment Social Security tax on his fishing income and employee Social Security tax on income he earned as a construction worker in the years prior to his death.

**14.** *See Brooks v. United States*, 337 U.S. 49, 53–54, 69 S.Ct. 918, 920–21, 93 L.Ed. 1200 (1949) (questioning propriety of allowing FTCA plaintiff to recover hospital expenses that government has already paid for under servicemen's benefit laws).

**15.** Noting the lack of precedent on the issue and the perhaps impossible nature of the task of determining the percentage of Social Security benefits attributable to the government, the

While the Third, Ninth and Tenth Circuits all applied the law of the state in which the tort was committed in determining that FTCA damages cannot be reduced by Social Security payments, there are no cases addressing the deductibility of Social Security payments in the exclusively federal domain of the Suits in Admiralty Act. The Supreme Court, however, has followed the collateral source doctrine in actions under the Federal Employers' Liability Act (FELA) and the Jones Act where damages are determined according to federal law. In *Eichel v. New York Central Railroad Co.*, 375 U.S. 253, 254, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), the Court held that evidence that the a FELA plaintiff was receiving a pension under the Railroad Retirement Act was inadmissable to mitigate the damages, because "[t]he benefits received under such a system of social legislation are not directly attributable to the employer." Similarly, in *Tipton v. Socony Mobil Oil*, 375 U.S. 34, 37, 84 S.Ct. 1, 3, 11 L.Ed.2d 4 (1963), the Court held that evidence that the Jones Act plaintiff had received compensation under the Longshoremen's and Harbor Workers' Compensation Act was inadmissible for the limited purpose of showing that the plaintiff was not covered by the Jones Act, much less for the purpose of mitigating damages. Because of the recognition by federal law of the collateral source doctrine and because of the wide acceptance of that doctrine in special fund cases under the FTCA, *see Price, supra* n. 12; Speiser, Krause and Gans, *The American Law of Torts*, Vol. 2 at 532 (1985), this court holds that Honour Brown's award cannot be reduced by any Social Security benefits that she may be receiving.

■ Honour Brown is also entitled to recover for the loss of her husband's services. *Sea-Land Services, Inc. v. Gaudet*

414 U.S. 573, 585, 94 S.Ct. 806, 814, 39 L.Ed.2d 9 (1974). At trial, Honour testified that she spends approximately six hours a week, or 300 hours a year, doing lawn and maintenance work that Gary used to do (Tr. 5–57). She valued this work at six to eight dollars an hour, based on her experience as to what a third person would charge. In addition, she now has to hire others to do work that Gary had previously done such as masonry and plumbing (Tr. 5–55). Given the fact that Gary was able to perform the lawn and maintenance tasks faster than Honour (Tr. 5–57), this court concludes that all such chores would have been accomplished by him within 300 hours a year. Ten dollars per hour is a reasonable estimate of the average worth of Gary's services, given the higher value of his plumbing and masonry work.[16] This court further estimates that Gary would have performed this work through the age of 65. Accordingly, Honour Brown is entitled to $3000 in services per year, commencing with the year of Gary's death. In order to account for general increases of productivity and the time value of money, this court will employ the practice, discussed above, of projecting the future value of the services by increasing their value at a rate of 1.5%, and then discounting the resultant future value to present value at a rate of 2%. *See* Appendix B.

As noted above, the Court in *Sea-Land* stated that a child's loss of nurture is compensable under DOHSA. The characterization of loss of nurture as pecuniary in nature stems from the Court's construction of a provision in the FELA allowing recovery for pecuniary damages in *Michigan Central Railroad v. Vreeland*, 227 U.S. 59, 71, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913):

> Nevertheless, the word [pecuniary] as judicially adopted is not so narrow as to

---

Tenth Circuit nevertheless remanded the case to the district court for a determination of the percentage of Social Security benefits contributed by the government. In *Smith*, the Third Circuit sharply disagreed with this approach, stating: "We believe that the government's payments are so minimal and so difficult to trace

that such an approach would be impracticable." This court agrees with the Third Circuit.

**16.** Honour Brown testified that she has had to pay a plumber $20 to $25 an hour to perform the type of work that Gary previously did (Tr. 5–57).

exclude damages ... when the beneficiary is a child, for the loss of that care, counsel, training and education which it might, under the evidence, have reasonably received from the parent, and which can only be supplied by the service of another for compensation.

In *Moore-McCormack Lines, Inc. v. Richardson,* 295 F.2d 583, 593 n. 9a (2d Cir. 1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 606, 7 L.Ed.2d 526 (1962), the court applied the rationale of *Vreeland* to a child's claim for loss of nurture under DOHSA: "The guidance of a parent in matters material, moral and spiritual is of a definite practical and financial value and is subject to pecuniary estimate."

In *Solomon v. Warren,* 540 F.2d 777, 778 (5th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), the court, in awarding damages under DOHSA to a child for loss of nurture, stated that such an award was contingent on the production of evidence showing that "the deceased parent was fit to furnish such training, and that training and guidance had actually been rendered."

In this case, Gary Brown never had the opportunity to actually provide training and guidance to his daughter Cary, because she was born after his death. *Solomon* did not involve a posthumous child. A strict application of its language to this case would have the absurd result of penalizing Cary Brown because she was deprived of her father's nurture for her entire childhood rather than a part thereof. Moreover, Honour Brown's testimony about the nature of the marriage in general and Gary's solicitude for young children in particular (Tr. 5–58, 59) convinces this court that Gary would have provided significant training and guidance to his daughter.

The view that a child's loss of nurture is a pecuniary injury compensable under DOHSA was not altered by *Higginbotham v. Mobil Oil,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978), which held that loss of society is not recoverable under DOHSA. While *Higginbotham* did not discuss the recoverability of damages for loss of nurture under DOHSA, every court subsequently confronted with the issue has held that such damages are recoverable.[17]

■ It is important to emphasize, however, that a child's claim for loss of nurture is limited to the pecuniary value of the services the deceased parent would have provided and cannot include damages for the emotional loss of growing up without a father. Taking into consideration the frequent absences that Gary Brown's occupation as a fisherman would have necessitated, this court estimates the economic value of the training and guidance Gary would have provided his daughter at $5000 a year commencing with the date of his death. Given the fact that Cary Brown has been and will be deprived of this training and guidance, she is entitled to damages for loss of nurture until she attains the age of 18.[18] Since these damages reflect the pecuniary value of the services that Cary Brown would have received, it is appropriate to account for the increase in the value of these services due to general increases in productivity by increasing the value of the services at a rate of 1.5% and discounting the resulting future value of the services at a 2% rate. *See* Appendix C.

In addition to suing on her own behalf under DOHSA, Honour Brown has asserted a claim on behalf of Gary Brown's estate for his pain and suffering before his death. The claim of Gary Brown's estate for damages for pain and suffering is a

---

**17.** *See McKay v. Rockwell International,* 704 F.2d 444, 464 (9th Cir.1983), *cert. denied* ⸺ U.S. ⸺, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984); *Nygaard v. Peter Pan Seafoods,* 701 F.2d 77, 81 (9th Cir.1983); *Bodden v. American Offshore, Inc.,* 681 F.2d 319, 329 (5th Cir.1982); *Barger v. Petroleum Helicopters, Inc.,* 514 F.Supp. 1199, 1210 (E.D.Tex.1981), *rev'd on other grounds,* 692

F.2d 337 (5th Cir.1982), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1316 (1983).

**18.** There is a clear consensus among the courts that have considered the issue that a child is not entitled to loss of nurture damages under DOHSA once he has attained the age of majority. *See Solomon v. Warren,* 540 F.2d 777, 789 (5th Cir.1977).

survival action in the respect that the claim belonged to the decedent and survives his death for the benefit of his estate. DOHSA by contrast is a wrongful death statute which provides the decedent's survivors with a cause of action for the pecuniary loss they have suffered as a result of the death. *See Sea-Land,* 414 U.S. at 575–76 n. 2, 94 S.Ct. at 810 n. 2 (distinguishing between wrongful death and survival statutes). While DOHSA has provided a federal wrongful death action for deaths on the high seas since its enactment in 1920, there was no federal action for pain and suffering until the Supreme Court recognized a cause of action "under general maritime law for death caused by violation of maritime duties" in *Moragne v. States Marine Lines,* 398 U.S. 375, 409, 90 S.Ct. 1772, 1792, 26 L.Ed.2d 339 (1970). In reliance on *Moragne,* many courts held that the newly recognized cause of action encompassed a survival action.[19]

■ In *Higginbotham v. Mobil Oil,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978), however, the Court held that a DOHSA plaintiff could not recover for the loss of the decedent's society, stating that insofar as DOHSA speaks

directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the Act becomes meaningless. There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted. In the area covered by the statute, it would be no more appropriate to prescribe a different statute of limitations, or a different class of beneficiaries.

Whereas DOHSA comprehensively covers the scope of a survivor's wrongful death action, the statute and its legislative history are distinguished by a "lack of reference to survival actions." *Kuntz v. Windjammer "Barefoot" Cruises,* 573 F.Supp. 1277, 1285 (W.D.Pa.1983), *aff'd* 738 F.2d 426 (3d

Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984). It follows therefore that a survival action based on *Moragne* is not pre-empted by DOHSA. The Fifth Circuit recently reached this conclusion in *Azzopardi v. Ocean Drilling and Exploration,* 742 F.2d 890, 894 (5th Cir.1984): ·

Since DOHSA is a wrongful death statute which, whether through inadvertence or design does not address survival of actions, it is entirely appropriate that the courts should fill what would otherwise be a legislative void by allowing the general maritime law survival action based on *Moragne* to supplement DOHSA.

The Fifth Circuit's holding that DOHSA does not pre-empt the assertion of a survival action is supported by the two other courts that have considered the issue. *See Kuntz,* 573 F.Supp. at 1286; *Chute v. United States,* 466 F.Supp. 61, 69–70 (D.Mass.1978), *related case rev'd on other grounds,* 610 F.2d 7 (1st Cir.1979).

■ The evidence at trial showed that Gary Brown was fully conscious when he was swept off the F/V Sea Fever and into the November seas which were up to 50 feet high and where the wind raged at over 70 miles per hour (Tr. 5–15, 16, 20). As Gary tread water and cried, "Hey. Hey, you guys," the Sea Fever turned back and made the first of several passes in an attempt to save him. The life ring the Sea Fever's crew threw at Gary, however, was blown away by the wind (Tr. 5–17). On the second pass, the Sea Fever's crew attempted to throw heaving line to Gary. The Sea Fever, however, was unable to get close enough to Gary to make the rescue. Peter Brown, the captain of the Sea Fever, testified: "Within one wave we'd get within 10 to 15 feet from him, and within one second the boat would be 30 feet from him" (Tr. 5–18). The third pass was likewise unsuccessful. Finally, on the fourth pass the crew was unable to find Gary. Peter

**19.** *See Law v. Sea Drilling Corp.,* 523 F.2d 793, 795 (5th Cir.1975); *Barbe v. Drummond,* 507 F.2d 794, 799–800 (1st Cir.1974); *Spiller v. Thomas M. Lowe, Jr. and Associates,* 466 F.2d 903, 909–10 (8th Cir.1972); *Greene v. Vantage Steamship Corp.,* 466 F.2d 159, 166–67 (4th Cir.1972).

Brown estimated that ten minutes elapsed between the time Gary went overboard and the time he was last seen (Tr. 5–19).

In absolute terms, ten minutes is not a long time. Given this setting, a man fighting for his life in a crushing, frigid November sea, ten minutes can reasonably be considered an eternity. This court finds $50,000 to be reasonable compensation for the pain and suffering endured by him. *See* Appendix F.

## II

### *William Garnos*

William Garnos was born on August 16, 1950 and drowned on November 22, 1980 at the age of 30. Prior to his death, William bought a house in Beverly, Massachusetts. Before purchasing the house, William told his parents that he wanted them to give up the home they were renting and move into the house he was planning to buy (Tr. 5–70). Accordingly, after William bought the house, his parents and maternal grandmother moved in and lived with him for approximately two years. At the time of his death, William was planning to marry and move out of his house to his wife's apartment. William, however, clearly expressed his intention to continue to support his parents and to let them live in his house for the rest of their lives (Tr. 5–89, 90).

■■■■■■ As stated in *Sea-Land*, a DOHSA plaintiff[20] is entitled to recover the financial contributions the decedent would have made to him had the decedent lived. In this case, William Garnos paid all of his parents' expenses except for groceries and the telephone bill (Tr. 5–92). In addition, William took personal responsibility for the maintenance of the house and grounds, either doing the work himself or paying oth-

ers to do it (5–78–80). In view of the testimony of William's parents and his demonstrated feeling for them, this court is persuaded that William would have continued to take responsibility for the maintenance of the house and grounds even after his marriage.[21]

The Garnos' damages are divisible into three components. First, it is evident that William would have paid off the $23,000 mortgage that was owing on the house at the time of his death, a forecast which even the defendant's economic expert accepts (Tr. 5–165). As a result of William's death, his parents have had to assume the mortgage payments (Tr. 5–77). Accordingly, William's parents are entitled to the outstanding balance on the mortgage at the time of William's death plus interest. *See* Appendix D.

The second component of damages is the value of the household essentials that William paid for, such as heating and materials for repairs. Since Mrs. Garnos had a life expectancy of 28 years at the time of her son's death, longer than that of her husband, the measure of damages is the amount that will have to be paid out for household essentials over the 28–year period, commencing with William's death (Tr. 5–166). The evidence at trial revealed that, in the year before William's death, he paid $1,693 for heating, electricity and insurance. In addition, William paid property tax of $1,392 a year. Finally, William spent $2,673 for painting and repair materials during the two years preceding his death, or an average of $1,336 per year. These expenses amount to an annual total of $4,421.[22] Unlike the other items of damages, the expense of these household essentials will not increase due to general in-

---

**20.** DOHSA plaintiffs are limited to the "decedent's wife, husband, parent, child, or dependant relative." 46 U.S.C. § 761.

**21.** Mrs. Garnos testified that William promised that, "Our living would go on as before he was married" (Tr. 5–89).

**22.** While the defendant's expert correctly identified the components of the household essentials

that William paid for, he evidently made a mistake of division in concluding that the per year average of the $2,673 that William expended for materials during the last two years of his life "was about a thousand dollars a year" (Tr. 5–165). This error accounts for the expert's erroneous conclusion that William's annual expenditure for household essentials was $4,065.

creases in productivity. Accordingly, the value of the lost household essentials can be calculated by discounting the stream of $4421 annual payments that William would have made throughout his mother's 28–year life expectancy to present value at a rate of 2%. *See* Appendix D.

The third component of damages is the value of the services that William would have continued to provide for his parents. The only evidence of the value of William's services was offered by Mr. Garnos, who estimated a value of $10 an hour based on his experience in hiring others to do the work (Tr. 5–85). Mr. Garnos also testified that he spends 700 hours a year doing work that William used to do while at home (Tr. 5–83, 84). In addition, Mr. Garnos has had to hire others to do work such as re-roofing, tree removal and storm window installation that William would have done (Tr. 5–85). Given William's age and ability, it is realistic to estimate that William would have accomplished all these tasks working 700 hours per year. Accordingly, the value of the lost services that William would have provided is $7000 per year. This figure must be increased at a rate of 1.5% per year for the period of Mrs. Garnos' life expectancy to account for general increases in productivity and discounted to present value by employing a real discount rate of 2%. *See* Appendix E.

Mr. Garnos also asserts a claim for William's pain and suffering on behalf of William's estate. Our knowledge of the facts surrounding William's death stems from the deposition testimony of Ernest Hazard, the sole survivor of the F/V Fairwind on which Garnos and the decedent David Berry were fishing at the time of their deaths. Hazard testified that he was in the pilothouse with Garnos and had just turned over the wheel to him when the Fairwind capsized and the pilothouse began to fill with water. After "two dives," Hazard found a hole in the pilothouse and managed to swim out of the Fairwind and get onto a

life raft that was secured to the vessel. Hazard remained on the life raft tied to Fairwind for between half an hour and an hour, after which the vessel began to sink and Hazard released the life raft (Plaintiffs' Ex. 47 in Liability Trial, at 77–78). On cross-examination, the government's attorney established that Hazard never saw or heard from Berry or Garnos after he left the vessel (*Id.* at 103).

The government asserts that there is no evidence to support the estate's claim for pain and suffering. This court, however, will not condition an award of pain and suffering upon the plaintiff's ability to present every grisly fact to the court. In this case, it is more likely than not that Garnos retained consciousness after the Fairwind capsized, that he was unable to find his way out of the pilothouse, and that he drowned.

In *Petition of Risdal and Anderson, Inc.*, 291 F.Supp. 353, 359 (D.Mass.1968), Judge Garrity awarded damages for pain and suffering in the absence of any direct evidence as to the decedents' deaths:

> Witnesses from other fishing vessels in the area testified that the storm in which the MIDNIGHT SUN was lost was "as severe as they had ever experienced." ... This court, of course, cannot find with certainty that each of the decedents experienced a specific amount of conscious physical or mental pain and suffering. Nevertheless, without presenting a parade of horribles that probably confronted the decedents, the court finds that the most reasonable inference to be drawn ... is that decedents did experience a considerable amount of conscious mental and physical pain and suffering....

The fact that Hazard observed Garnos up to the time the Fairwind capsized makes the award of damages for pain and suffering even more compelling in this case than in *Petition of Risdal*, where there were no survivors from the lost vessel.[23] Accord-

---

**23.** *See also Petition of United States Steel Corp.* 436 F.2d 1256, 1275–76 (6th Cir.1970) (award for pain and suffering appropriate where dece-

dents were last observed performing duties below deck and court could infer that they were conscious at time they drowned), *cert. denied,*

ingly, this court holds that the estate of William Garnos is entitled to $50,000 for his pain and suffering. *See* Appendix F.

### III

#### David Berry

David Berry was born on December 7, 1959 and was two weeks shy of his 21st birthday at the time of his death on November 22, 1980. After graduating from high school, he began fishing full-time. He served as a deckhand on the F/V Fairwind for the eight months preceding his death. David's father, George Berry, testified that, immediately prior to his death, David had expressed his intention to join his father's fish business and move into his father's home (Tr. 5–108, 109). While David's father testified that he did not discuss with David the tasks David would be responsible for at the father's home, he did state that David had performed approximately a hundred of hours of services per year when he had stayed with his father in the past (Tr. 5–112).

 Since there is no evidence that David's father received any pecuniary contributions from his son in the past, nor any indication that David intended to make such contributions in the future, David's father cannot recover for loss of support. David's father is also not entitled to damages for the value of the household services that David would have provided, because these damages are hopelessly speculative. Assuming that David would have returned to his father's home, it is not at all clear that he, at the age of 21, would have stayed there for any appreciable length of time.

David's father also asserts a claim on behalf of David's estate for David's pain and suffering. At his deposition, Hazard testified that he last saw David Berry minutes before the Fairwind capsized in the forecastle (Plaintiffs' Ex. 47 at 102–103). Thus, Berry was clearly conscious at the time the Fairwind capsized. The fact that Hazard never saw Berry during the half hour he was on the life raft tied to the vessel strongly suggests that Berry was unable to escape from the vessel and that he drowned as a result. Accordingly, this court holds that the estate of David Berry is entitled to $50,000 for his pain and suffering.

### IV

#### Prejudgment Interest

 The plaintiffs in this case assert that they are entitled to prejudgment interest. While the allowance of prejudgment interest in an admiralty action is generally within the discretion of the court, *See McKay v. Rockwell International,* 704 F.2d 444, 463 (9th Cir.1983), the court's discretion is limited when the United States is the defendant. The plaintiffs' action in this case is premised on the United States general waiver of sovereign immunity under the Suits in Admiralty Act for admiralty actions, *supra* n. 1. The Suits in Admiralty Act, however, limits the amount of prejudgment interest to 4% accruing from the time of the suit's filing. 46 U.S.C. § 743, 745; *See United States v. Eastern SS Lines,* 171 F.2d 589, 593 (1st Cir.1948). Accordingly, this court awards prejudgment interest at a rate of 4% for the time that has elapsed between the filing of the suit on January 23, 1981 and the present.

### V

#### Damage Summary

Honour Brown has sued the government in her own capacity, as the personal representative of Gary Brown's estate, and as the personal representative of her minor daughter. Honour Brown is entitled to

---

402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971); *Petition of Marina Mercante Nicaraguense, S.A.,* 248 F.Supp. 15, 28 (S.D.N.Y.1965) (award for pain and suffering proper where decedents last seen on deck of sinking tug), *aff'd in relevant part,* 364 F.2d 118, *cert. denied,* 385

U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); *Meehan v. Central Railroad,* 181 F.Supp. 594, 625 (S.D.N.Y.1960) (jury award of $10,000 for pain and suffering sustained where only evidence showed that decedent drowned when train he was riding derailed and plunged into river).

$629,606.62 in her individual capacity. In arriving at this figure, this court calculated the present value of the total support she would have received from Gary Brown's earnings less deductions for taxes and Gary Brown's personal maintenance. *See* Appendix A. The court then took the resulting $711,807.85 and added $112,798.77, representing the total present value of the lost services Gary would have provided. *See* Appendix B. Thus, Honour Brown's total pecuniary loss is $824,606.62. Honour Brown, however, has already collected $195,000 of this loss from the settlement of another suit she brought under DOHSA for Gary Brown's death against the Sea Fever Corporation.[24] The $195,000 settlement must, of course, be subtracted from Honour Brown's damages, because to do otherwise would be to allow her two recoveries. Consequently, Honour Brown is entitled to $629,606.62 from the government for her personal pecuniary loss.

Honour Brown is also entitled in her capacity as the personal representative of Cary Brown to collect $94,331.03 for Cary's loss of nurture. *See* Appendix C. Finally Honour Brown is entitled to recover $59,651.32 as the personal representative of Gary Brown's estate for his pain and suffering. *See* Appendix F. Thus, Honour Brown in her individual and represenative capacities is entitled to a total payment of $783,588.97.

Mr. and Mrs. Garnos brought suit against the government in their individual capacities for the loss of support and services they suffered as a result of their son William's death. In addition, Mr. Garnos sued as the personal representative of William's estate, seeking compensation for his son's pain and suffering. Mr. and Mrs. Garnos have suffered three elements of pecuniary loss. They have lost $27,439.61 due to their assumption of a mortgage that William would have paid off, $125,834.90 in household essentials that he would have provided, and $199,240.96 worth of services

that he would have performed. *See* Appendices D and E. Thus, Mr. and Mrs. Garnos are entitled to compensation equal to their total pecuniary loss of $352,515.47. In addition, Mr. Garnos in his capacity as personal representative of his son's estate, is entitled to $59,651.32 for his son's pain and suffering. *See* Appendix F.

Mr. George Berry has sued the government in his own capacity and as the personal representative of his son's estate. While Mr. Berry does not have a claim for personal pecuniary loss, he is entitled to recover $59,651.32 as the personal representative of his son's estate for his son's pain and suffering. *See* Appendix F.

## VI

### *Sea Fever's Claim for Indemnification*

The Sea Fever Corporation ("Sea Fever"), the owner of the vessel on which Gary Brown was working at the time of his death, has brought a third-party action against the United States. Following Gary Brown's death in November 1980, his widow brought suit against Sea Fever in January 1981. The name of that lawsuit was *Brown v. Sea Fever Corp.*, CA 81–169–T. On September 14, 1983, Sea Fever settled the suit against it for $195,000. Approximately four months later, on January 18, 1984, Sea Fever filed this indemnification claim against the United States.

■ Sea Fever's indemnification action must fail. The "legal principle that everyone is responsible for the consequences of his own wrong," is well-established in admiralty law. *See Burgess v. M/V TAMANO*, 373 F.Supp. 839, 847–48 (D.Me.1974); *Tri-State Oil Tool Industries*, 410 F.2d 178, 181 (5th Cir.1969). The complaint in *Brown v. Sea Fever Corporation* alleged that the Sea Fever's negligence and the unseaworthiness of its vessel caused Gary Brown's death. In plaintiff's pre-trial memorandum, she alleged that plaintiff was swept overboard through a plywood

---

**24.** The Sea Fever Corporation, which owned the Sea Fever, has asserted a claim for indemnifica-tion against the government. *See infra.*

door in the vessel's wheelhouse. Plaintiff alleged that the plywood door was inadequately reinforced, insufficiently secured and improperly maintained. The plaintiff further alleged that the vessel was not equipped with proper life-saving equipment.

In *Araujo v. Woods Hole, Martha's Vineyard, Nantucket Steamship Authority*, 693 F.2d 1 (1st Cir.1982), the court stated that a "tort-based right to indemnification may be found where there is a great disparity in the fault of the parties." The court went on, however, to assert that tort-based indemnification is usually "available only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault." The court continued to note that "passive negligence" is "limited to instances in which the indemnitee [is] vicariously or technically liable." [25] In *Araujo*, tort-based indemnification was unavailable because the negligence of the shipowner's own employees in loading a ferry was a proximate cause of the plaintiff's injuries. Similarly, in this case, there is nothing to suggest that Sea Fever was vicariously liable for the government's negligence or that Sea Fever's $195,000 settlement was premised on anything other than its own negligence and the unseaworthiness of its vessel. *See In the Matter of the Complaint of American Ex-*

*port Lines, Inc.*, 568 F.Supp. 956, 965 (S.D. N.Y.1983).

*American Export Lines* is noteworthy for its interpretation of *United Sandy Hook Pilots' Association v. United States*, 355 F.2d 189 (2d Cir.1965). *Sandy Hook* arose out of an accident in which a vessel belonging to the plaintiff Association collided with a Coast Guard cutter, thereby injuring a Coast Guard crewman. The injured crewman then brought suit against the Association. Over two years after the collision, the Association brought suit against the United States under the Public Vessels Act, 46 U.S.C. § 781 et seq., alleging that the government's negligence was the sole cause of the accident and that the government should therefore be liable for any recovery by its employee.

The Public Vessels Act incorporates the two year statute of limitations of the Suits in Admiralty Act under which Sea Fever seeks indemnification in this case.[26] In reliance on that two year statute of limitations, Judge Dawson held in *United New York Sandy Hook Pilots' Association v. United States*, 191 F.Supp. 893 (S.D.N.Y. 1961), that the Association's action against the government was time barred: "If ... this action is one for indemnification, the statute would not begin to run until the liability becomes fixed, or as here, until [the crewman's] action is determined. But the libel does not allege any cause of action

---

**25.** The First Circuit reached its decision in *Araujo* without considering the impact of *Loose v. Offshore Navigation, Inc.*, 670 F.2d 493 (5th Cir.1982). In *Loose*, the Fifth Circuit replaced the rule that a passively negligent party can recover from an actively negligent party with the rule that liability should be apportioned among tortfeasors according to their relative culpability. The court based this departure from the active-passive negligence doctrine on the rationale of *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), which discarded the equal apportionment of damages regardless of fault, between vessels involved in a collision or parties responsible for a stranding, in favor of requiring an inquiry into the comparative fault of the participants to the collision or stranding. The Fifth Circuit asserted that the active-passive negligence doctrine "was developed to alleviate the harsh rule that prohibited apportionment among tortfeasors," and concluded that, "[c]om-

parative fault seeks the same objective both more persuasively and more accurately." 670 F.2d at 501. The result in this case is no different regardless of whether the active-passive negligence or comparative fault doctrines are applied. In either event, Sea Fever's $195,000 settlement represented the amount that it deemed appropriate to pay in order to avoid the risk of suffering a larger adverse judgment as a result of its negligence or the vessel's unseaworthiness. There is nothing in the plaintiff's complaint or in her supporting pre-trial papers that indicate that she was attempting to hold Sea Fever vicariously liable for the government's failure to maintain the Georges' Bank buoy.

**26.** Section 5 of the Suits in Admiralty Act, 46 U.S.C. § 745, provides that, "Suits as authorized by this chapter may be brought only within two years after the cause of action arises."

for indemnification." The court went on to state that, "No contract exists for indemnification.... Rather the Government's liability, if it exists at all, is that of a tort-feasor and not as an indemnitor." *Id.* at 894–95.

The Association did not appeal Judge Dawson's decision, but instead settled its suit with the crewman and brought a second suit against the government. In an unpublished opinion, Judge MacMahon dismissed this second action on res judicata principles. The Second Circuit subsequently affirmed Judge MacMahon's dismissal. While it was not necessary for the Second Circuit to consider the merits of Judge Dawson's reasoning in affirming Judge MacMahon's res judicata dismissal, the Second Circuit indicated its approval of Judge Dawson's "sharp distinction between a claim of an indemnitee under a contract, where, as he thought, the statute of limitations 'would not begin to run until the liability becomes fixed,' [citations omitted], and a claim against a tortfeasor, which he thought would arise at the time of the accident." 355 F.2d at 190.

The government now seeks to invoke the Second Circuit's *Sandy Hook* opinion for the proposition that the plaintiff's tort indemnification action is barred because more than two years elapsed between Gary Brown's death in November 1980 and the Sea Fever's filing of its indemnification claim on January 18, 1983. As the *American Export Lines* court pointed out, however:

> *Sandy Hook* involved a distinction for purposes of determining when a cause of action arises, between claims for contribution and claims for·indemnity. It specifically discussed claims for *contractual* indemnity because no claim for tort indemnity was involved in *Sandy Hook*. On the facts, none was possible. A party may sue in admiralty for tort indemnity if he is vicariously liable for the culpable conduct of another, but he may not recover on the theory if he himself has been guilty of negligence.

568 F.Supp. at 964. Thus, the *American Export Lines* court held that a tort indemnification action could be maintained where it was alleged that the government's negligence in designing a vessel's steering mechanism was the sole cause of a collision that occurred more than two years before the claim for indemnification was filed.

 *American Export Lines*, however, is of little solace to Sea Fever. Sea Fever's $195,000 settlement arose out of a lawsuit alleging that Sea Fever was responsible for its own negligence and the unseaworthiness of its vessel. There was no allegation that Sea Fever was vicariously liable for the government's negligence. Consequently, like the Association in *Sandy Hook*, Sea Fever has no cause of action for tort indemnification. To the extent that Sea Fever's claim for indemnification is actually a claim for contribution, that claim is barred by the two year statute of limitations under the reasoning set out in the *Sandy Hook* cases. Even if the statute of limitations had not yet run on the plaintiff's contribution claim, there is nothing in the record before this court to indicate that $195,000 does not represent Sea Fever's fair share of responsibility for the injuries suffered in this case.

An order will issue.

Appendix A

HONOUR BROWN'S CLAIM FOR LOST SUPPORT

| | SUPPORT | INTEREST | YEAR |
|---|---|---|---|
| | $23,906.00 | $4,614.49 | 1981 |
| | $26,535.66 | $3,904.48 | 1982 |
| | $29,454.58 | $3,034.41 | 1983 |
| | $32,694.59 | $1,981.16 | 1984 |
| | $36,290.99 | | 1985 |
| TOTAL PRINCIPAL TO DATE BEFORE TAXES | $148,881.82 | $13,534.53 | |
| TOTAL INTEREST AND PRINCIPAL TO DATE BEFORE TAXES | $162,416.35 | | |

TOTAL INTEREST AND PRINCIPAL TO DATE BEFORE TAX-
ES—Continued

| SUPPORT | INTEREST | YEAR |
|---|---|---|
| $36,835.35 | | 1986 |
| $37,387.89 | | 1987 |
| $37,948.70 | | 1988 |
| $38,517.93 | | 1989 |
| $39,095.70 | | 1990 |
| $39,682.14 | | 1991 |
| $40,277.37 | | 1992 |
| $40,881.53 | | 1993 |
| $41,494.75 | | 1994 |
| $42,117.18 | | 1995 |
| $42,748.93 | | 1996 |
| $43,390.17 | | 1997 |
| $44,041.02 | | 1998 |
| $44,701.63 | | 1999 |
| $45,372.16 | | 2000 |
| $46,052.74 | | 2001 |
| $46,743.53 | | 2002 |
| $47,444.69 | | 2003 |
| $48,156.36 | | 2004 |
| $48,878.70 | | 2005 |
| $49,611.88 | | 2006 |
| $50,356.06 | | 2007 |
| $51,111.40 | | 2008 |
| $51,878.07 | | 2009 |
| $52,656.24 | | 2010 |
| $53,446.09 | | 2011 |
| $54,247.78 | | 2012 |

| | |
|---|---|
| PRESENT VALUE OF FUTURE LOST SUPPORT BEFORE TAXES | $906,364.20 |
| PRESENT VALUE OF TOTAL LOST SUPPORT BEFORE TAXES | $1,068,780.56 |
| LESS STATE AND LOCAL TAXES (18.4% OF GROSS INCOME) | $196,655.62 |
| LESS PERSONAL MAINTENANCE (15% OF GROSS INCOME) | $160,317.08 |
| PRESENT VALUE OF TOTAL LOST SUPPORT AFTER TAXES AND PERSONAL MAINTENANCE | $711,807.85 |

Appendix B

HONOUR BROWN'S CLAIM FOR LOST SERVICES

| | SERVICES | INTEREST | YEAR |
|---|---|---|---|
| | $3,000.00 | $579.08 | 1981 |
| | $3,045.00 | $448.04 | 1982 |
| | $3,090.67 | $318.40 | 1983 |
| | $3,137.04 | $190.09 | 1984 |
| | $3,184.09 | | 1985 |
| TOTAL PRINCIPAL TO DATE | $15,456.80 | $1,535.62 | |
| TOTAL PRINCIPAL AND INTEREST TO DATE | $16,992.42 | | |
| | $3,231.85 | | 1986 |
| | $3,280.33 | | 1987 |
| | $3,329.53 | | 1988 |
| | $3,379.48 | | 1989 |
| | $3,430.17 | | 1990 |
| | $3,481.62 | | 1991 |
| | $3,533.85 | | 1992 |
| | $3,586.85 | | 1993 |
| | $3,640.66 | | 1994 |
| | $3,695.27 | | 1995 |
| | $3,750.70 | | 1996 |
| | $3,806.96 | | 1997 |
| | $3,864.06 | | 1998 |
| | $3,922.02 | | 1999 |
| | $3,980.85 | | 2000 |

TOTAL PRINCIPAL AND INTEREST TO DATE—Continued

| | SERVICES | INTEREST | YEAR |
|---|---|---|---|
| | $4,040.57 | | 2001 |
| | $4,101.17 | | 2002 |
| | $4,162.69 | | 2003 |
| | $4,225.13 | | 2004 |
| | $4,288.51 | | 2005 |
| | $4,352.84 | | 2006 |
| | $4,418.13 | | 2007 |
| | $4,484.40 | | 2008 |
| | $4,551.67 | | 2009 |
| | $4,619.94 | | 2010 |
| | $4,689.24 | | 2011 |
| | $4,759.58 | | 2012 |
| | $4,830.97 | | 2013 |
| | $4,903.44 | | 2014 |
| | $4,976.99 | | 2015 |
| | $5,051.64 | | 2016 |
| | $5,127.42 | | 2017 |
| | $5,204.33 | | 2018 |

| | |
|---|---|
| PRESENT VALUE OF FUTURE LOST SERVICES | $95,806.37 |
| TOTAL PRESENT VALUE OF LOST SERVICES | $112,798.79 |

*Appendix C*

CARY BROWN'S CLAIM FOR LOST NURTURE

| | NURTURE | INTEREST | YEAR |
|---|---|---|---|
| | $5,000.00 | $965.13 | 1981 |
| | $5,075.00 | $746.74 | 1982 |
| | $5,151.12 | $530.67 | 1983 |
| | $5,228.39 | $316.82 | 1984 |
| | $5,306.82 | | 1985 |
| TOTAL PRINCIPAL TO DATE | $25,761.33 | $2,559.36 | |
| TOTAL PRINCIPAL AND INTEREST TO DATE | $28,320.69 | | |
| | $5,386.42 | | 1986 |
| | $5,467.22 | | 1987 |
| | $5,549.22 | | 1988 |
| | $5,632.46 | | 1989 |
| | $5,716.95 | | 1990 |
| | $5,802.70 | | 1991 |
| | $5,889.74 | | 1992 |
| | $5,978.09 | | 1993 |
| | $6,067.76 | | 1994 |
| | $6,158.78 | | 1995 |
| | $6,251.16 | | 1996 |
| | $6,344.93 | | 1997 |
| | $6,440.10 | | 1998 |
| PRESENT VALUE OF FUTURE LOST NURTURE | $66,010.34 | | |
| TOTAL PRESENT VALUE OF LOST NURTURE | $94,331.03 | | |

*Appendix D*

MR. AND MRS. GARNOS' CLAIM
FOR LOST SUPPORT

| | SUPPORT | INTEREST | YEAR |
|---|---|---|---|
| | $4,421.00 | $853.37 | 1981 |
| | $4,487.32 | $660.27 | 1982 |
| | $4,554.62 | $469.22 | 1983 |
| | $4,622.94 | $280.13 | 1984 |
| | $4,692.29 | | 1985 |
| TOTAL PRINCIPAL TO DATE | $22,778.17 | $2,262.99 | |
| TOTAL PRINCIPAL AND INTEREST TO DATE | $25,041.16 | | |
| | $4,762.67 | | 1986 |
| | $4,834.11 | | 1987 |
| | $4,906.62 | | 1988 |

TOTAL PRINCIPAL AND INTEREST TO DATE—Continued

| SUPPORT | INTEREST | YEAR |
|---|---|---|
| $4,980.22 | | 1989 |
| $5,054.93 | | 1990 |
| $5,130.75 | | 1991 |
| $5,207.71 | | 1992 |
| $5,285.83 | | 1993 |
| $5,365.12 | | 1994 |
| $5,445.59 | | 1995 |
| $5,527.28 | | 1996 |
| $5,610.19 | | 1997 |
| $5,694.34 | | 1998 |
| $5,779.75 | | 1999 |
| $5,866.45 | | 2000 |
| $5,954.45 | | 2001 |
| $6,043.76 | | 2002 |
| $6,134.42 | | 2003 |
| $6,226.44 | | 2004 |
| $6,319.83 | | 2005 |
| $6,414.63 | | 2006 |
| $6,510.85 | | 2007 |
| $6,608.51 | | 2008 |

| | |
|---|---|
| PRESENT VALUE OF FUTURE LOST SUPPORT | $100,793.74 |
| PRESENT VALUE OF TOTAL LOST SUPPORT | $125,834.90 |
| OUTSTANDING MORTGAGE PRINCIPAL | $23,000.00 |
| INTEREST ON MORTGAGE PRINCIPAL | $4,439.61 |
| TOTAL MORTGAGE CLAIM | $27,439.61 |

Appendix E

MR. AND MRS. GARNOS' CLAIM
FOR LOST SERVICES

| SERVICES | INTEREST | YEAR |
|---|---|---|
| $7,000.00 | $1,351.18 | 1981 |
| $7,105.00 | $1,045.43 | 1982 |
| $7,211.57 | $742.94 | 1983 |
| $7,319.75 | $443.55 | 1984 |
| $7,429.54 | | 1985 |

| | | |
|---|---|---|
| TOTAL PRINCIPAL TO DATE | $36,065.87 | $3,583.10 |
| TOTAL PRINCIPAL AND INTEREST TO DATE | $39,648.97 | |

| SERVICES | INTEREST | YEAR |
|---|---|---|
| $7,540.99 | | 1986 |
| $7,654.10 | | 1987 |
| $7,768.91 | | 1988 |
| $7,885.45 | | 1989 |
| $8,003.73 | | 1990 |
| $8,123.79 | | 1991 |
| $8,245.64 | | 1992 |
| $8,369.33 | | 1993 |
| $8,494.87 | | 1994 |
| $8,622.29 | | 1995 |
| $8,751.62 | | 1996 |
| $8,882.90 | | 1997 |
| $9,016.14 | | 1998 |
| $9,151.38 | | 1999 |
| $9,288.66 | | 2000 |
| $9,427.99 | | 2001 |
| $9,569.40 | | 2002 |
| $9,712.95 | | 2003 |
| $9,858.64 | | 2004 |
| $10,006.52 | | 2005 |
| $10,156.62 | | 2006 |
| $10,308.97 | | 2007 |
| $10,463.60 | | 2008 |

| | |
|---|---|
| PRESENT VALUE OF FUTURE LOST SERVICES | $159,591.99 |
| PRESENT VALUE OF TOTAL LOST SERVICES | $199,240.96 |

Appendix F

| | |
|---|---|
| ESTATE OF WILLIAM GARNOS' CLAIM FOR PAIN AND SUFFERING | $50,000.00 |
| INTEREST | $9,651.32 |
| TOTAL CLAIM FOR PAIN AND SUFFERING | $59,651.32 |
| ESTATE OF DAVID BERRY'S CLAIM FOR PAIN AND SUFFERING | $50,000.00 |
| INTEREST | $9,651.32 |
| TOTAL CLAIM FOR PAIN AND SUFFERING | $59,651.32 |
| ESTATE OF CARY BROWN'S CLAIM FOR PAIN AND SUFFERING | $50,000.00 |
| INTEREST | $9,651.32 |
| TOTAL CLAIM FOR PAIN AND SUFFERING | $59,651.32 |