Karen MARCING, Plaintiff,

v.

FLUOR DANIEL, INC., a California
corporation, Defendant.

No. 91 C 4936.

United States District Court,
N.D. Illinois, E.D.

June 16, 1993.

Barbara Levine Holcomb, Chicago, IL, and Mary L. Bell, Oak Park, IL, for plaintiff.

Nina G. Stillman and Malory N. Harriman, Chicago, IL, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, Senior District Judge.

This action by Karen Marcing ("Marcing") against her ex-employer Fluor Daniel, Inc. ("Fluor") embraces three claims: one charging sex discrimination in violation of Title VII, another charging age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the third charging a violation of the Equal Pay Act.[1] Because Fluor's conduct that forms the gravamen of Marcing's claims antedated December 1, 1991, but the trial of this action was held this spring, the case possesses (among a number of issues) the question whether and to what extent the Civil Rights Act of 1991 (the "1991 Act") might apply here.

This Court (like most if not all of its colleagues) had viewed our Court of Appeals' decision in *Luddington v. Indiana Bell Tel. Co.*, 966 F.2d 225, 227–30 (7th Cir.1992) as having sent a strong signal negating any potential application of the 1991 Act to Marcing's case. But two developments—our Court of Appeals' acceptance of *Mojica v. Gannett Co.*, 986 F.2d 1158 for en banc hearing and the Supreme Court's granting of certiorari in *Landgraf v. USI Film Prod.*, —— U.S. ——, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993)—suggested to this Court that the most prudent procedure was to conduct the trial in a manner that would provide an answer on both liability and damages no matter how the legal issues turned out. In that way no new trial should be needed whichever way the law develops in *Landgraf* and *Mojica*. As chance would have it, our Court of Appeals (earlier this month, shortly after the trial of this action) has spoken of just such a possible procedure—see *Townsend v. Indiana University*, 995 F.2d 691, 694 (7th Cir.1993).

To accomplish that goal, this Court convened a jury and obtained a jury verdict on all issues, while at the same time having advised the litigants that it was conducting a simultaneous bench trial on Marcing's Title VII claim. What follows are this Court's findings of fact ("Findings") and conclusions of law ("Conclusions") as to that claim, entered independently by this Court in accordance with Fed.R.Civ.P. ("Rule") Rule 52(a) on the assumption that no aspect of the 1991 Act will ultimately apply to Marcing's Title VII claim.[2]

To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both those respects,

---

1. Marcing also claims that Fluor retaliated against her for having filed discrimination charges against it.

2. If it were ultimately decided that the 1991 Act *does* apply to any aspect of the Title VII claim, the previously-entered jury verdict will stand as to that aspect. And of course the jury verdict is certainly binding as to the ADEA and Equal Pay Act claims, on which Marcing already had a right to jury trial under pre–1991 Act law.

see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985).

## Findings of Fact

1. On December 4, 1961 Marcing (then age 19) was hired by Pioneer Service and Engineering Co. (Fluor's corporate predecessor[3]) as a stenographer. Marcing's abilities first led to her becoming Executive Secretary to the then head of Fluor's Procurement Department, Edward Bradley ("Bradley"). Then with his encouragement she worked her way up through Fluor's Procurement Department, becoming an assistant buyer in tandem with her executive secretarial duties, and then a full-fledged buyer (most recently Fluor has changed the title of "buyer" to "Procurement Specialist," but these Findings will treat the terms as interchangeable). Finding 21 will expand on Marcing's background and experience in those activities.

2. Marcing resigned her position with Fluor on March 13, 1990. At that time she was a Procurement Specialist III in the Procurement Department. Among her other claims, Marcing asserts that her resignation was really a constructive discharge. Later Findings will expand upon and uphold that claim.

3. In the fall of 1989 Marcing was assigned the task of obtaining updated bids on seven packages included in a project known as "Salt City."[4] Because some aspects of that assignment were outside of Marcing's prior range of experience, she requested training and assistance from her superiors on the Salt City bid proposals—in particular on the establishment of more complex contract conditions than had been involved in her prior buying assignments. Although Marcing was not given that necessary training and assistance, she still completed the buying portions of those packages in a professional manner.

4. In early December 1989, as the result of discussions among Fluor's Edward Touchette ("Touchette," the Project Procurement Manager on the Salt City Project), Fluor's new Manager of Procurement David Bellamy ("Bellamy") and Procurement Department Manager Richard Martin ("Martin"), it was decided to assign Marcing to the full-time buyer position on the Salt City project. On December 6, 1989 Bellamy told Marcing that he would be assigning 75 bid packages from Salt City to her.

5. Initially Marcing declined that assignment because she was aware of the limitations on her experience and of the fact that she had not received the necessary assistance that she had requested on the phase of the project referred to in Finding 3. That initial negative response stemmed from Marcing's perception that her nonacceptance of the assignment would best serve the interests of both Fluor and its Salt City client. Fluor's immediate reaction was a decision among the three individuals referred to in Finding 4 to assign the Salt City project to a much younger and less experienced Procurement Specialist III, Suzanne Markham ("Markham"), who until then had been doing the less demanding Administrative Procurement assignment.[5]

6. By the following day Marcing had decided that she was willing to undertake the Salt City project despite her concerns, particularly when Martin then told her that Markham would be given the Salt City assignment and that Marcing would be relegated to Markham's Administrative Procurement assignment—really a type of demotion for Marcing (despite no reduction in pay or benefits) in light of her past tenure, experience and skills. Martin further told Marcing that other client projects work would likely be unavailable to her in the future, effectively limiting (if not foreclosing entirely) her opportunity for further development and growth.

---

3. For convenience "Fluor" will be used to denote Marcing's employer throughout her entire period of employment.

4. Salt City had been in a tentative planning status for some time. Now that the project was definitely going ahead, it was necessary to obtain extensions on the prior bids (all of which naturally had limited expiration dates).

5. "Administrative Procurement" refers to Fluor's internal purchasing for its own needs rather than the needs of its clients' projects (see Finding 9).

7. Despite Marcing's expressed willingness to take on the more demanding Salt City assignment, Martin, Bellamy and Touchette took the hard line position that a decision had been made to move Markham into that assignment and to give Marcing the choice of Administrative Procurement or nothing in terms of full-time employment. When Marcing expressed reluctance to accept that move backwards into a dead-end position with no real potential for client buying, on December 7 Martin asked for Marcing's resignation. Although she initially agreed to tender it (in shock and anger), in a meeting the very next day (December 8) Marcing told Martin that she would not in fact resign.

8. Martin had also involved Fluor's Director of Human Resources Donald Huston ("Huston") in that last-mentioned December 8 meeting. At the end of that meeting they told Marcing that they would get back to her with a final decision. Just a few days later Fluor's then Director of Project Operations James Reynolds ("Reynolds") told Marcing that she could have only the limited options of (a) transferring to another job (the Administrative Procurement position) with no prospect of further assignments in project procurement, (b) working part-time on project procurement or (c) taking a leave of absence.

9. As indicated in n. 5, the Administrative Procurement position offered to Marcing consisted of "overhead buying" for the office facility, requiring less skill than the Project Procurement position in which Marcing had been employed up to December 1989. Marcing was overqualified for the Administrative Procurement position, as she had performed the same or similar duties in the years 1974 to 1978. She also legitimately feared, based on what had been said to her during the several meetings, that taking that job would cut her off from technical project procurement, as she would not be performing project buying in that position. As Finding 6 reflects, a transfer to the Administrative Procurement position as her sole assignment would essentially have been a type of demotion for Marcing, in spite of the fact that Marcing's pay and job classification would have remained the same.

10. Faced with what effectively amounted to a Hobson's choice among three undesirable alternatives, Marcing chose part-time employment instead of resigning her position or taking a de facto demotion. As of January 1, 1990 Marcing's employment status was therefore changed to part-time.

11. Although Fluor's personnel involved in establishing the course of conduct and in making the decisions described in Findings 5 through 8 have characterized those decisions as purely business-oriented, this Court finds that they would not have treated Marcing as they did—and most particularly that they would not have refused to let her reconsider the matter overnight and accept the Salt City assignment the very next day—if she had not been both a woman and an older employee. Marcing has proved to this Court's satisfaction that both her sex and her age played critical roles in, and had determinative influences on the outcome of, Fluor's employment decisions affecting Marcing. This Court expressly finds that Fluor would not have made the same decisions if it had not taken Marcing's sex into account, and it also concurs in the jury's determination that Fluor would not have made the same decisions if it had not taken Marcing's age into account. Finally, because part-time work on project procurement reasonably appeared to Marcing to be the least unpalatable of the three alternatives that had been forced on her by Fluor's sex-biased and age-biased imposition of conditions (because that part-time alternative at least appeared to hold out the prospect of further project procurement assignments as the office's business increased), Marcing's choice of that alternative was a reasonable response to the decision that she was compelled to make.[6]

---

**6.** Because Marcing was entitled to a jury trial on her ADEA and Equal Pay Act claims under the law antedating the 1991 legislation, and because the jury has resolved those claims in her favor, all further Findings will focus on her claim of sex discrimination. This Finding adverts to both

Fluor's age-discriminatory conduct and its sex-discriminatory conduct because in that sense this is a "mixed motives" case (see *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)) of an unusual nature: Both of Fluor's operative considerations (sex and age)

12. On January 3, 1990 Marcing filed a charge with the Illinois Department of Human Rights that Fluor had discriminated against her on the basis of both her age and her sex, and she had that charge cross-filed with the Equal Employment Opportunity Commission ("EEOC"). Fluor received the charge of discrimination on January 10, 1990.

13. Between January 1, 1990 and March 13, 1990 Marcing's working conditions deteriorated in a number of ways: Marcing was required to obtain a superior's signature authorizing all purchases on her project work, she was removed from the Technical Information distribution list and excluded from procurement staff meetings, and she was required to keep a daily log in addition to her usual time sheets. None of Marcing's male counterparts was treated in any of those adverse manners. Moreover, between February 7, 1990 and March 13, 1990 Fluor refused to assign Marcing to new projects.

14. While Marcing was employed on part-time status, her male co-workers—Jack Planz ("Planz"), Michael Riley ("Riley") and Robert J.C. Damon ("Damon")—continued to work full-time (and also some overtime) for Fluor, performing various duties that Marcing could have been able to perform. Those male co-workers continued to receive new project assignments, while Marcing did not. Fluor failed to offer any of the overtime work to Marcing or to discuss with her whether she could perform any of those assignments.[7] Fluor also took some of the work on Marcing's projects away from her and gave it to Planz.

15. On February 21, 1990 Kara Mitchell, an employee in Fluor's Human Resources Department, transmitted a memorandum to Human Resources Director Huston at his request. That memorandum reflected that Marcing and female co-worker Markham were receiving salaries lower than those received by their male co-workers, including male co-workers who as to Marcing compared unfavorably in terms of experience and demonstrated skills.

16. Male co-worker Riley, who assumed the Administrative Procurement position after January 1, 1990, was permitted to continue with his project procurement duties in conjunction with his administrative duties (basically the Administrative Procurement job was added to keep his hours up to a full 40 hours per week). That arrangement, particularly the continuation of his project procurement assignments with a view to his receiving more such assignments when they became available, was not an option that had been offered to Marcing when she was offered the Administrative Procurement position in December 1989. Again that reflects a difference in treatment that this Court finds to have been sex-based.

17. In March 1990 Marcing was told by Bellamy that her hours would be further reduced to 12 hours per week. No other Procurement Department employee was relieved of his or her full-time duties or subjected to a reduction in hours. Fluor seeks to justify that decision as based on the permissible business consideration that if the volume of its business had declined so as to

---

were illegitimate under the law. Fluor will not be heard to say that it would have reached the same decision (requiring Marcing to take the Administrative Procurement job) if it had been considering a younger woman (Markham, the far less experienced employee who already had that job), nor can it rely on the fact that at later dates it assigned Administrative Procurement work to males within the ADEA age-protected group (when other work was at a low ebb) in addition to their project procurement assignments. It would impermissibly distort the law if an employer were permitted to escape liability for employment discrimination when it is driven by two independently illegal discriminatory motivations.

7. Fluor argues with considerable persuasiveness that most often the assignment of overtime hours to an employee who is already involved in a

project is more efficient and cost-effective than spreading the work by allocating those hours to another employee (who would have to undertake a new learning curve). It may well be that if Fluor had taken all relevant (and legally permissible) factors into account in making its business decisions, it would thus have arrived at the same conclusions as to how to assign the additional work involved. But the problem is that Fluor's decision was tainted by its decisionmakers' sex-based bias against Marcing, so that there is no way to determine what course of action Fluor would have followed in the absence of such bias. Hence, as with the decision referred to in Finding 17, Fluor can draw no comfort or insulation from the notion that its decision was assertedly business-justified.

call for a reduction in total hours, it was a legitimate decision to impose that on a part-time employee rather than on those working full time. But that assertion ignores two factors:

(a) Marcing's part-time status had been forced on her by Fluor's impermissibly sex-based and age-based imposition of the Hobson's choice described in earlier Findings. Fluor's further reduction in her hours to a point at which Marcing could not sustain herself economically simply exacerbated the effects of that first adverse and discriminatory employment decision.

(b) It is impossible, because of Fluor's sex-discriminatory perception of Marcing, to determine what business decision Fluor would have reached if the situation had been different—if it had a part-time employee in Marcing's position. For aught that appears, if it had not been for the fact that Marcing as an older woman was deemed expendable, Fluor would have made the equally legitimate decision (as many industries have done) to spread the available work by cutting down on the hours of the full-time employees to keep the part-time person as a member of the available workforce when a hoped-for upturn in business would take place.

In any event, that further drastic cutback on her hours made the economic aspect of the job (added to the oppressive working conditions referred to in Finding 13) intolerable for Marcing.

18. In March 1990 Marcing was forced to resign her position with Fluor (a) because she could not afford to live on the salary payable for just 12 hours' work per week that had now been offered to her by Fluor and (b) because she had been excluded from the normal professional activities of the Procurement Department. At that time Fluor had made Marcing's working conditions so intolerable that a reasonable person in her position would have felt compelled to resign.

Hence Marcing was in fact effectively forced to resign due to those intolerable conditions. That constituted her constructive discharge by Fluor.

19. During Marcing's tenure with Fluor, particularly since the retirement of her mentor Bradley, she has been treated less favorably than her male buyers/procurement co-workers.[8] For example, Marcing continued to perform typing duties while working as a buyer, and she received a lower salary and lower benefits than were received by comparable males. This Court finds that the testimony of the Fluor decisionmakers—principally Bellamy and Martin, and James Reynolds as well—manifested their unexpressed but actual view of Marcing as an inferior because she was a woman who had worked her way up from a clerical position: She was not "one of the boys" (either literally or figuratively).

20. For purposes of comparison in terms of evaluating the effects of the sex discrimination suffered by Marcing, the male employees in Fluor's Procurement Department (both current and former employees) who were reasonably similarly situated to Marcing were Damon, Riley and Planz. Both the male and female employees of Fluor serving in the position of buyer performed assignments requiring equal skill, effort and responsibility under similar working conditions.

21. Marcing (who did not have a college degree) began performing buying duties for Fluor in the late 1970's, in addition to her duties as Bradley's Executive Secretary. In 1977 she was promoted to assistant buyer, and in 1983 she became a full-time buyer. Marcing was consistently promoted as a buyer and received acceptable to above-average performance appraisals. Indeed, she received a bonus for her work on the Midland project. As a buyer, Marcing had signature authority for orders up to $1 million until that authorization was arbitrarily and dis-

---

8. Bradley had originally recognized that Marcing's abilities went well beyond those demanded by her initial secretarial job. It was for that reason that he introduced her to, and trained her in, the buying function (see Findings 1 and 21). Though her purchasing duties increased commensurately with her increasing skill and experi- ence, the fact that she had begun with a very low level of compensation as a secretary meant that the moderate salary increases that she received over the years never brought her up to the compensation levels of male co-workers with comparable skill and experience.

criminatorily cancelled in 1990 (see Finding 13). She bought engineered and complex products, including (among others) cable, instrumentation, public address systems and some service work. Marcing acted as buyer for different projects such as chemical and nuclear power plants. For those purposes she negotiated with vendors. Marcing took over as Project Procurement Manager for the Midland project in its windup phase, and she served in that capacity until her resignation from Fluor's employ. In summary, Marcing was well qualified to do the work of a Procurement Specialist III and more than satisfied Fluor's job requirements for that position.

22. Damon became a buyer with Fluor in January 1989. His prior work experience had included purchasing reproductive equipment, security systems, packaging components, boxes and chemicals. During the hiring process Bellamy assessed Damon only as an entry-level buyer. Damon had a college degree in an area unrelated to purchasing. Yet Damon's starting pay was $2,950 per month at the Procurement Specialist III level, although Marcing was earning only $2,810 per month in the same Procurement Specialist III job at that time. In January 1990 Damon's monthly salary was increased to $3,250, while Marcing's salary remained at its $2,810 level.

23. Riley became a buyer with Fluor in 1987. Riley like Marcing did not have a college degree. Riley's 1988 performance appraisal rated his performance between "acceptable" and "needs improvement," while his 1989 performance appraisal carried a rating of "below job expectations." Even though according to Fluor performance was a key ingredient in determining an employee's salary, Riley also consistently earned a higher salary than that received by Marcing.

24. Planz's background with Fluor was in expediting, a position that is less challenging than buying. In late 1989 Planz began to perform the duties of a buyer. Planz too did not have a college degree. Nonetheless Planz received a salary of $3,910 per month (again that was the period in which Marcing received $2,810 monthly).

25. Thus Marcing consistently received a lower salary than that received by any of her male co-workers in the Procurement Department who performed work similar to the work performed by Marcing. And even though Marcing had been employed by Fluor as a Buyer and Procurement Specialist longer than any of her male counterparts, Fluor chose (a) to cut her hours and benefits, (b) to treat her less favorably than her male counterparts and (c) to trigger her constructive discharge. In summary, in all material aspects Marcing was treated less favorably than similarly situated males.

26. Both after Marcing was assigned to part-time status and later after her employment with Fluor terminated, her male co-workers continued their employment with Fluor and performed the duties that had been carried out by Marcing. Within four weeks after Marcing's resignation from Fluor, it hired a full-time employee (also classified as a Procurement Specialist III) to perform the Administrative Procurement job. Riley, the male employee who had held that job while Marcing was on part-time status, resumed his full-time work on project buying. Yet Fluor did not offer that Administrative Procurement position to Marcing when it was informed of her intention to resign in March 1990.

27. In part Fluor has contended that Marcing failed to mitigate her damages by turning down the Administrative Procurement position in December 1989. But under all the circumstances referred to in earlier Findings, Marcing was reasonable in viewing the conditions of the Administrative Procurement position that Fluor offered to her in December 1989—conditions less favorable than those that Fluor then offered to a male co-worker—as not comparable to the project procurement position in which Marcing was employed in December 1989. Moreover, almost immediately thereafter (only one day later) Marcing told Fluor that she was willing to take the Salt City assignment, but Fluor then arbitrarily refused to reconsider its decision (as this Court finds it would not have refused but for Marcing's being an older female buyer) and forced her to take one of the already-described less favorable op-

tions. Because the option of part-time work then held out the prospect of Marcing's resumption of full-time project buying when conditions improved (as the Administrative Procurement job that Fluor offered to Marcing did not), she cannot be viewed as having failed to mitigate her damages by choosing the part-time option rather than Administrative Procurement.

28. Marcing located employment with the law firm of Pretzel & Stouffer and began employment there on March 25, 1990, shortly after her resignation from Fluor's employment. Marcing's position with Pretzel & Stouffer was as secretarial floater. That position terminated on May 30, 1990. Marcing's ensuing employment (in every instance as a legal secretary) comprised:

(a) working for Mora & Netzky from November 26, 1990 until February 28, 1992;

(b) working for Palmateer & Zummer from March 1, 1992 until March 22, 1992; and

(c) working for Joseph A. Terc from March 25, 1992 until May 21, 1992.

During each period of her unemployment, Marcing diligently sought employment.

29. Marcing's positions with Pretzel & Stouffer, Mora & Netzky, Palmateer & Zummer and Joseph A. Terc were not substantially comparable to her position with Fluor. Thus the terminations of those later employments, whether voluntary or involuntary, did not amount to a failure by Marcing to mitigate her damages.

30. Marcing has reasonably and diligently attempted, but has not been able, to locate new employment comparable to her former employment with Fluor. She has not refused any job offer for a position that was substantially comparable to her last full-time position with Fluor. In summary, Marcing has met her duty to mitigate her damages resulting from Fluor's wrongful actions.

31. As particularized in the following Findings, Marcing has sustained damages relating to her employment with Fluor and the termination of that employment. Those damages caused by Fluor's wrongful actions comprise:

(a) loss of wages,

(b) loss of benefits,

(c) loss of future earnings and benefits and

(d) attorney's fees and costs.

With respect to the second and third of those items, Marcing's benefits during her employment with Fluor included profit sharing, health insurance and time off with pay. Fluor also provided Marcing with retirement plans, which were in part contributory.

32. Between March 13, 1989 and March 13, 1990 (adjusting for Marcing's half-time work schedule from January 13 through March 13, 1990), the difference in pay between Marcing and Planz totalled $10,931, the difference between Marcing and Damon totalled $2,112 and the difference between Marcing and Riley also totalled $2,112. Because of the arguable differences between Marcing and Planz for equal pay purposes, this Court determines that either Damon or Riley was Marcing's appropriate male equivalent for comparison purposes.

33. Marcing's last annual salary with Fluor was $33,720. Assuming a 5% salary increase each year, Marcing would have earned $124,235 in wages between January 1, 1990 and the end of the trial. As against that, Marcing's total income from wages or salaries during the same period was $51,300 ($13,400 in 1990 [including her wages from Fluor from January 1, 1990 through March 13, 1990], $26,000 in 1991 and $11,900 in 1992). To obtain that income, Marcing incurred job search expenses of approximately $2,375 from March 13, 1990 through the end of the trial.

34. To meet her ordinary living expenses during the period at issue, Marcing has been forced to make substantial early withdrawals from her retirement savings, paying substantial penalties for doings so. Those penalties through the end of the trial total $7,179 ($2,479 in 1990, $2,500 in 1991 and $2,200 in 1992).

35. Except for catastrophic coverage for uninsured persons that is provided through a government entity, Marcing no longer has full health insurance (which was provided to her at no cost by Fluor). Marcing has been required to pay a total of $4,579 for COBRA

and health insurance costs since March 31, 1990. If Marcing were to obtain employment and pay $33.50 per month in health insurance costs, which was the amount that she paid at one employer (Pretzel & Stouffer), in 15 years of payments (assuming no increase in such costs) she would pay $6,030.

36. Fluor's retirement program consists of two plans:

(a) the Employee's Retirement Plan, funded by company contributions to an irrevocable trust; and

(b) the Salaried Employees' Savings Investment Plan ("SIP"), which offers employees the opportunity to save money for retirement by investing before-tax dollars under a Section 401(k) provision (with company-matching contributions supplementing the employee's SIP savings).

As of June 30, 1989 Marcing's retirement plan accounts with Fluor totalled $111,217.75 ($82,970.20 in the Retirement Plan and $28,247.46 in the SIP).

37. According to Fluor's calculations, based on Fluor's assumptions (a) that its contributions to the plans (which aggregated 11% of Marcing's base compensation according to Fluor's own document, P.Ex. 144) and Marcing's contribution (4% of her base compensation) would have remained constant and (b) that Marcing would have received a 5% increase in salary per year, Marcing's total accounts would have accumulated by October 1992 (when Marcing reached age 50) to $142,487 (at an annual rate of 4% in growth) or $150,180 (at a 6% growth rate) or $158,158 (at an 8% growth rate). On those same assumptions, Fluor's calculations are that Marcing's retirement accounts would have accumulated at age 55 to $209,967 (at 4%) or $239,005 (at 6%) or $271,893 (at 8%), and at age 60 to $302,160 (at 4%) or $368,358 (at 6%) or $449,900 (at 8%). If Marcing had not withdrawn her retirement accounts until she reached the age of 65, her accounts would have been worth $427,201 (at 4%) or $554,838 (at 6%) or $725,345 (at 8%).

38. When constructively discharged by Fluor, Marcing withdrew the $125,788 that she had in the retirement program as of that date. Because she then had the use of that money, her lost benefits as of her 50th birthday in 1992 were not (as her counsel's proposed Findings would have it) the difference between that amount and the relevant figure referred to in the first sentence of Finding 37. Instead the $125,788 must be brought forward at the same rate as the assumed growth rate. Finding 39 of this Court will employ Fluor's middle-range assumption of 6% as the reasonable growth rate, and will employ the same rate for projecting to present value and discounting to present value.[9]

39. As of the time of trial Marcing's previously withdrawn retirement funds of $125,788 would have had a value (based on the assumed 6% growth rate) of $149,816. As of the same date the $150,180 figure referred to in the first sentence of Finding 37 would have had a value of $154,620, so that one part of Marcing's loss in retirement benefits (the portion based on contributions that Fluor would have made through Marcing's 50th birthday, but calculated to the time of trial) amounts to $4,804. Based on the same assumptions as made by Fluor in P.Ex. 144 and on the further assumption that Marcing would have continued in Fluor's employ until she reached age 65 if it had not been for Fluor's age-discriminatory and sex-discriminatory conduct (an assumption that this Court finds reasonable—see Conclusion 14), Marcing's loss in future retirement benefits to her 65th birthday—discounted to present value at the time of trial at the same 6% rate—amounts to $83,739. Accordingly Marcing's total loss in retirement benefits, calculated in terms of their present value as of the time of trial, aggregates $88,543.

9. This Court is of course aware that the most appropriate approach to the present value problem is to use as a discount rate the pure cost of money—variously dealt with as between 1% and 3% (see *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194, 1199 (7th Cir.1982) and *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 542 & n. 25, 550 n. 31, 103 S.Ct. 2541, 2553 & n. 25, 2557 n. 31, 76 L.Ed.2d 768 (1982)). But where (as here) part of the calculation has been done by one of the parties using a rate that takes the inflation factor into account as well, it is equally permissible to leave that factor in throughout the calculation, rather than backing it out of both sides (the presumed growth rate and the discount rate)— see *O'Shea*, 677 F.2d at 1199–1200.

■ 40. Because Marcing's reinstatement by Fluor is not feasible, she is entitled to front pay. Based on Fluor's own estimated 5% annual rate of increase in Marcing's base compensation, her annual salary at the time of trial would have been approximately $37,175.[10] To convert that salary to present value, it is reasonable to use the same 5% figure as a discount rate for her presumed earnings in future years.[11] Essentially, then, the net effect of an assumed 5% rate of annual growth in salary and a 5% discount rate is that the present value of each future year's compensation amounts to the same level of compensation as at the time of trial: $37,175.

41. As Finding 39 and Conclusion 14 reflect, this Court finds entirely reasonable Marcing's stated intention to have worked for Fluor for the remainder of her working life—in this instance to the age of 65. From the time of trial to that date is almost exactly 14½ years, so that the lost front pay comes to $539,037.50. But notwithstanding Marcing's current difficulties in obtaining employment despite her best efforts to do so, this Court cannot assume that she would be unemployable during that same future period. Instead it determines that it would be reasonable to deduct from that figure the present value of annual earnings from the type of job that Marcing testified she might have been able to obtain but did not find acceptable.[12] That testimony referred to one job as paying in the "low twenties," but to any later job opportunities as having offered lower levels of

income. This Court finds a reasonable stabilized annual deduction to be $20,000 as of the time of trial,[13] subject to the same "total offset" based on a 5% annual growth rate and the same discount rate. That would call for a deduction of $290,000 from the $539,037.50 figure, leaving a net front pay recovery of $249,037.50.

42. During the trial of all three of Marcing's claims before a jury, Marcing's counsel requested that the jury award under Title VII backpay damages of $109,085; future pecuniary losses of $362,676; job search expenses of $2,378; and compensatory damages (apart from those specified above) of $50,000. Marcing's counsel also requested an award of punitive damages, but she did not suggest an amount to the jury.

43. On April 26, 1993 a unanimous jury entered verdicts for Marcing under the Equal Pay Act, ADEA and Title VII. Those awards consisted of $109,000 in backpay plus liquidated damages of $60,884 under the Equal Pay Act; $109,000 in backpay under ADEA; and $109,000 in backpay plus compensatory damages of $67,500 under Title VII.

44. These Findings do not affect the jury verdicts on Marcing's Equal Pay Act and ADEA claims, as to which judgment is ordered to be entered nunc pro tunc April 26, 1993.[14] As for Marcing's Title VII claim, judgment is ordered to be entered in the sum of the following amounts:

10. That figure checks out with the computer-derived calculation that Marcing's counsel provided as Attachment A to her proposed Findings.

11. In fact that "total offset" method of calculation is (if anything) likely to be favorable to Fluor, because numerous studies suggest that the aspect of future salary increases attributable to non-inflationary factors is likely to exceed the "real interest rate"—the pure cost of money (see n. 9). Thus the "total offset" approach may well amount to *over*-discounting—see *O'Shea,* 677 F.2d at 1199–1200; *Jones & Laughlin,* 462 U.S. at 550 n. 31, 103 S.Ct. at 2557 n. 31.

12. Such a deduction avoids a result under which Fluor would effectively be required to provide Marcing with the economic equivalent of a disincentive to work.

13. That stabilized annual figure for the 14½ year period to Marcing's 65th birthday takes into ac-

count the difficulty that persons who are over 50 encounter in seeking to enter the labor market, as well as its being based on the only kinds of employment that Marcing has been able to obtain from time to time. It also considers the important factor that unless Marcing were fortunate enough to find full-time employment, the ability to obtain even a low-paying job decreases dramatically as an employee's age escalates through his or her 50s and beyond.

14. To the extent that those jury verdicts represent amounts that are also included as part of the judgment ordered in these Findings and Conclusions, Marcing is of course not entitled to obtain a double recovery. This Court will await both parties' prompt submissions as to the extent of such overlap.

(a) $2,112 in diminished earnings due to sex-based discrimination between March 13, 1989 and March 13, 1990 (see Finding 32);

(b) $75,310 in lost earnings caused by such discrimination to the date of trial (see Finding 33);

(c) $7,179 in penalties from the forced early withdrawals of Marcing's retirement accounts (see Finding 34);

(d) $10,609 in increased health insurance costs (see Finding 35);

(e) $88,543 in lost retirement benefits (see Findings 36–39); and

(f) $249,037.50 in lost future earnings (see Findings 40–41).

Marcing is also entitled to prejudgment interest on all components of that judgment that represent prejudgment amounts rather than future amounts discounted to present value.

*Conclusions of Law*

1. This Court has had jurisdiction over this action (including the aspects properly decided by jury trial) pursuant to 28 U.S.C. §§ 1331 and 1343(4) and 29 U.S.C. §§ 216(b) et seq. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b).

2. This action has been brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII"); ADEA, 29 U.S.C. §§ 621 et seq.; and 29 U.S.C. § 206(d) (the "Equal Pay Act"). Before Marcing filed this action, she satisfied the statutory preconditions of filing charges with, and then obtaining a right-to-sue letter from, EEOC. All further Conclusions relate only to Marcing's Title VII claim as set forth in those charges.

3. To establish a prima facie case of sex-based disparate treatment under Title VII, Marcing must prove by a preponderance of the evidence (*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)) that (*Griffin v. Board of Regents of Regency Univ.*, 795 F.2d 1281, 1285 (7th Cir.1986)):

(a) she is a female;

(b) she was doing at least a satisfactory job of meeting her employer Fluor's stated job requirements;

(c) she was treated adversely or terminated; and

(d) after the discriminatory treatment, her position either remained open or was filled.

4. Title VII also makes it unlawful for an employer to discriminate against an employee for making a charge of discrimination. To prove her claim of retaliation under Title VII, Marcing must prove by a preponderance of the evidence that (*Klein v. Trustees of Indiana Univ.*, 766 F.2d 275, 280 (7th Cir.1985)):

(a) she filed a charge of discrimination against Fluor;

(b) she suffered an adverse employment action or actions by Fluor; and

(c) she suffered the adverse employment action or actions because she filed the charge of discrimination.

5. For purposes of each of Marcing's claims, "adverse employment action" is not limited solely to loss or reduction of pay or monetary benefits, but can also encompass other forms of adversity, including subtle distinctions in the terms and conditions of her employment (*Collins v. Illinois*, 830 F.2d 692, 702–04 (7th Cir.1987)).

6. If Fluor were able to articulate one or more legitimate, non-discriminatory reasons for Marcing's adverse treatment or termination, Marcing could rebut that contention by showing that the asserted reason or reasons is or are pretextual (*Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095). Pretext can be shown (a) directly by persuading this Court that Fluor was more likely motivated by a discriminatory reason or (b) indirectly by establishing that Fluor's articulated reason or reasons is or are not worthy of belief (*id.*). Marcing has actually shown both of those things here.

7. If Fluor were found to have mixed motives for any adverse employment actions—in part legitimate and nondiscriminatory and in part discriminatory—Marcing would be entitled to prevail if Marcing's sex "played a motivating part" in those adverse

actions (*Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. at 1790 (plurality opinion by Justice Brennan); accord, *id.* at 259, 109 S.Ct. at 1795 (concurring opinion of Justice White); *id.*, at 278–79, 109 S.Ct. at 1805–06 (concurring opinion of Justice O'Connor); *id.* at 284, 109 S.Ct. at 1808 (dissenting opinion by Justice Kennedy)). It is unnecessary to address the issue of shifting burdens of proof that splintered the Court in *Price Waterhouse*, for Marcing has proved that her sex indeed played a motivating part in Fluor's adverse employment actions of which she complains. And as Conclusion 9 reflects, Marcing has also satisfied the somewhat different articulation of the substantive standard in the Supreme Court's most recent disparate treatment decision.

8. In a situation where (as here) Marcing was not fired by Fluor but resigned from her employment, she is entitled to treat her resignation as a constructive discharge if she can establish that a reasonable employee would have felt compelled to resign under the circumstances to which she had been subjected (*Brooms v. Regal Tube Co.*, 881 F.2d 412, 423 (7th Cir.1989)). Enforced idleness or a humiliating experience, as well as one that may permanently impair an employee's professional skills, may be considered when determining if a constructive discharge has occurred, and additional consideration may be given to whether there has been a pattern of discriminatory treatment over time directed toward the employee (*Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1193–94, 1199 (7th Cir.1992); *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 950 (7th Cir.1989), *modified on other grounds*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). Marcing has clearly borne her burden in that respect. Fluor's sex-discriminatory treatment referred to in Findings 5 through 8 effectively forced Marcing to take what she reasonably viewed as the least unsatisfactory of a set of unfair alternatives: part-time work. That in turn created a situation that Fluor responded to by cutting her hours even further so that she could not sustain herself economically and was forced to resign. That constitutes a paradigmatic case of constructive eviction.

9. Even though written in an ADEA case that dealt with some issues applicable to age discrimination alone, the Supreme Court's most recent employment discrimination decision (*Hazen Paper Co. v. Biggins*, — U.S. —, —, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) (citations omitted)) has stated the test for liability in disparate treatment cases in a manner applicable to sex discrimination as well as to age discrimination:

> In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait. Or the employer may have been motivated by the protected trait on an ad hoc, informal basis. Whatever the employer's decision-making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.

In this instance Marcing's sex actually played a role in Fluor's adverse employment decisions and had a determinative influence on the outcome.[15]

10. Based on the evidence presented at trial, this Court finds and concludes that Marcing has proved by at least a preponderance of the evidence that Fluor discriminated against her because of her sex by its adverse treatment and ultimate constructive discharge of Marcing. Although Marcing did not also prove her claim that Fluor retaliated against her for filing a charge of discrimination, that is irrelevant to Marcing's recovery under Title VII.

11. Once discrimination has been proved as in this case, an award of backpay is within this Court's discretion in order to make Marcing whole for injuries suffered as a result of Fluor's wrongful ac-

---

**15.** As the jury decided (and this Court independently agrees from hearing the evidence in the case), the same is true as to Marcing's age. In fact, Fluor's adverse employment decisions were tainted by the confluence of those protected traits in Marcing.

tions (*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 413–22, 95 S.Ct. 2362, 2369–74, 45 L.Ed.2d 280 (1975)). Because backpay must be awarded unless "special factors" are shown (*Horn v. Duke Homes, Div'n of Windsor Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985)), and because there are no such "special factors" here, backpay is appropriate in this case. Even if the principle is viewed in terms of a less forceful characterization—a statement of Marcing's presumptive entitlement to backpay (*EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 817 (7th Cir.1990))—this is clearly a case for such an award.

12. Backpay awards may properly include all forms of compensation: bonuses, vacation pay, pensions and health insurance benefits in addition to regular wages (*Kossman v. Calumet County*, 849 F.2d 1027, 1032 (7th Cir.1988); *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir.1986)). Unemployment compensation generally is not deducted from a backpay award (*Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1429 (7th Cir.1986)), and this Court sees no reason to do so here.

13. Prejudgment interest should be awarded on backpay as an appropriate exercise of the court's authority to fashion relief that makes the injured party whole and to award full compensation to the victim of wrongdoing (*Lorenzen v. Employees Retirement Plan of Sperry & Hutchinson Co.*, 896 F.2d 228, 236 (7th Cir.1990); *Hunter*, 797 F.2d at 1425–26). This Court concludes that such an award is entirely appropriate here.

14. Any prevailing Title VII plaintiff is presumptively entitled to reinstatement into her prior or a comparable position "absent exceptional circumstances demonstrating that the position is no longer available or where a continued reduction in forces occurs" (*Gaddy v. Abex Corp.*, 884 F.2d 312, 319 (7th Cir.1989)). Where as here reinstatement is not feasible, front pay may properly be awarded to plaintiff until a suitable job becomes available. Front pay represents the present value of the future income that plaintiff would have earned if she had remained employed by defendant for the rest of her working life, or until some other time when plaintiff would have found other

suitable employment (*Hybert v. Hearst Corp.*, 900 F.2d 1050, 1055–56 (7th Cir.1990)). Unlike the situations in *Hybert* and the next-cited *Graefenhain* case, it is not at all speculative to hold that if it were not for Fluor's sex-based and age-based discrimination Marcing would have remained employed during the lengthy future period found here: She was a bright and loyal employee of long standing who had shown continuing growth in a job in which she had performed well over the years. Marcing's loss of pension benefits should also be considered in determining the front pay award (*Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1210 (7th Cir.1989)), and this Court has done so here.

15. Although Marcing has a duty to take reasonable steps to mitigate her damages, the proof of such reasonable efforts is not onerous (*Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n. 16, 102 S.Ct. 3057, 3065 & n. 16, 73 L.Ed.2d 721 (1982); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983)). Moreover, the burden of proof on that issue rests at all times upon Fluor (*Gurnee Inn*, 914 F.2d at 818).

16. On that score Marcing has no duty to accept or to continue in a position that is not comparable in responsibilities, working conditions or salary to her former position with Fluor. Moreover, Marcing may abandon a noncomparable position to resume her search for comparable employment (*Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234–35 (7th Cir.1986)). Nor is Marcing required to go into another line of work, accept a demotion or take a demeaning position (*Ford Motor*, 458 U.S. at 231 & n. 16, 102 S.Ct. at 3065 & n. 16; *Graefenhain*, 870 F.2d at 1202). On all the evidence, Marcing has not failed to take reasonable efforts to mitigate her damages.

17. Attorneys' fees and costs must be awarded to prevailing plaintiffs under Title VII unless special circumstances make such an award unjust (*Albemarle Paper*, 422 U.S. at 415, 95 S.Ct. at 2370; *Eichman v. Linden & Sons, Inc.*, 752 F.2d 1246, 1248 (7th Cir.1985)). No circumstances here mili-

tate against an award of full fees and costs in favor of Marcing.

\* \* \*

Judgment is ordered to be entered in favor of Karen Marcing and against Fluor Daniel, Inc. nunc pro tunc April 26, 1993, in the amount calculated in accordance with Finding 44. Because that amount requires a calculation of the prejudgment interest to be included in the judgment and because this Court will not be sitting from June 21 through June 25, counsel for the parties are ordered to confer in the interim and to submit to this Court's chambers on or before June 25, 1993:

1. a joint calculation of the judgment amount if possible, or alternatively

2. separate calculations of the proposed judgment amount, together with separate explanations of the parties' methods of calculation.

This case is set for a status hearing at 9:30 a.m. on June 29, 1993, at which time final judgment will be entered.

One other item of unfinished business remains, though its resolution is obvious in the light of the foregoing Findings and Conclusions. On April 20, 1993, at the conclusion of Marcing's case in chief, Fluor filed its alternative motion (1) for judgment as a matter of law pursuant to Rule 50(a) or (2) for judgment on partial findings as a matter of law pursuant to Rule 52(c). At that time this Court deferred ruling, enabling Fluor to proceed with its case in chief without waiving the issues posed by its motion. For reasons that are evident from what has gone before, Fluor's motion is now denied in its entirety.